All right. We next have on the calendar Moreland-Richardson v. City of Snellville, Georgia. We'll hear first from Mr. Daniels. Good morning, ma'am. Please record. Judges, my name is Harry Daniels. I represent Appellate Phyllis Moreland-Richardson. You know, this case is inundated with facts and a record that a jury could conclude that Ms. Richardson, the first African-American appointed city clerk for the City of Snellville, who had over 30 years of government service, was objected to desperate treatment, discriminatory termination, hostile work environment based on her race, and retaliatory termination after she engaged in protective activity. The record is clear. The City of Snellville City's Council at the time had an issue with race. During the previous mayor, Mayor Kelly Kautz, the mayor who appointed Ms. Richardson, as mayor for the City of Snellville, the city rejected all of her appointments of African-Americans to serve on various boards for the City of Snellville. Instead, they voted to place Caucasians on the boards. Mayor Kautz did not make appointments solely based on race. She appointed Caucasian whites, just as well as she appointed African-Americans. And all the African-Americans that she appointed was also qualified to serve on the respective boards. Mr. Daniels, this is Judge Karnes. All that is very general sort of background information, but it would help me if you would focus more specifically on your particular claims. And I believe your first claim is that when your client did get the position, when after the litigation it was decided that, in fact, Mayor Kautz had the right to unilaterally appoint her and remove a woman who had been on the job with the county for 18 years, that she could do that. Your first claim is that your client received disparate pay and disparate work duties as opposed to what the predecessor had gotten. If you could focus on your specific claims and the evidence on those claims, I think that would be helpful to me. Yes, Your Honor. Thank you. As it comes to her disparate pay as it relates to Ms. Richardson, Ms. Richardson has had 30 years, 35 years of government service in the City of Miami-Dade Board of Commissioners. She, in fact, was a deputy clerk and had the same duties, similar duties as all clerks throughout the state of Georgia. She was not afforded the opportunity, even given a courtesy, to determine her qualifications before the city council unilaterally made the decision to give her entry-level pay. As it relates to the comparative, Ms. Melissa Arnold, the previous clerk, Ms. Arnold was, like you state, a 19-year employee for the City of Snailville, but she was also appointed as an interim basis in 2009, where she did not have any supervisory experience. She only assisted in certain things, wasn't the one who was actually in a particular role, such as extra duties. However, she was given a pay, I believe it was $52,000 or $53,000, and Ms. Richardson was not even afforded an opportunity to make determinations and qualifications in order to determine what her pay should or should not be. The city council- Mr. Daniels, Mr. Daniels, the standard we apply is, let's assume we're at the pre-tech stage here, I know that there were also some rulings that you also had met a promissory case, but let's assume you have. The standard would be whether there were neutral, non-discriminatory reasons offered for the decision that the city made as to her pay, and then it's your burden to show that those were pre-tech reasons based on race, not based on the reasons given. And my understanding from the record is that the city, that her predecessor did have a lot more experience with that particular job, was well-known to the board, and had a lot more duties than your client was given when she became clerk. She was doing less duties, and that in arriving at a salary for your client, that the city went through a survey of other comparable cities to see what a fair starting salary would be. That's their reason. What is your argument, or your evidence, why that reason is a pre-tech for racial discrimination? Well, thank you, Judge. Well, the city council stripped Ms. Richardson of her duties, the traditional duties held by the city clerk that the former mayor actually opposed to it. It was a exhibit to show those duties. So when you're looking at the duties for Ms. Richardson versus Ms. Arnold, the traditional duties held by the clerk, such as serving as a director over the administrative department, the municipal clerk, serving as election superintendent, as well among other various duties, the city council unilaterally stripped the duties away from Ms. Richardson. Mr. Daniels, my understanding is their explanation for that would be that over the years that her predecessor was such a respected member of the city family that she had shown the competency to do things that a clerk doesn't normally have to do, be a purchasing agent, be a bid supervisor, be the IT supervisor over certain units. And that that was something beyond what a clerk should do, and having a brand new person in without any confidence that this brand new person could necessarily do these extra clerk types of duties, they did not assign them to your client. How do you show that that explanation is a pre-tech for racial discrimination? Well, Your Honor, when you look at the issue as to whether Ms. Richardson had the ability to do those particular duties, and I will say that some of the duties that Ms. Arnold, the previous clerk, had were those extra assignments, such as the purchasing agent, as you stated. However, those duties that laid out the traditional duties of the clerk were not duties that was given to Ms. Arnold just because Ms. Arnold had this long term. Those are duties that were traditionally held out for the previous clerk before Ms. Arnold to be a department director, as supervising over the administrative department. So these duties were not just duties specifically assigned to Ms. Arnold on a sole basis, Ms. Arnold longevity with the city. These are duties that were assigned, that were given to the clerk for the city of Snellville. The clerk for the city of Snellville was basically the second highest appointed position for the city. What the council did here, they stripped those duties away. It basically made Ms. Richardson a glorified secretary of keeping records and doing open records, keeping minutes and doing open records. And if you look at Ms. Arnold and you compare the things of Ms. Arnold and Ms. Richardson, you talk about the work history of Ms. Arnold versus the work history of Ms. Richardson. Obviously, Ms. Richardson did not work in the city of Snellville government. How she had a long term of government service in another city and did some of the same comparable things that Ms. Arnold did. And here's the whole thing. They did not, when I say they, the city council did not even take the opportunity to determine if Ms. Richardson could even do the job comparable or do it better. They just decided, you know what, we're going to change her, make her entry level. We're not going to speak to her, not going to talk to her, and give her an opportunity to see if she's even qualified. But the question to you, Judge, is that, or the answer to you, Judge, is not as to whether these duties were given to Ms. Arnold solely for Ms. Arnold. These were traditional duties held out for the city clerk and that was actually placed into the record, not duties that specifically for Ms. Arnold that Ms. Richardson did not have the ability or given the opportunity to do. One of the things that we looked at, one of the things that we, of course, aired is when we talk about the comparatives. However, we briefed that extensively in our brief as to comparatives of Ms. Arnold, as well as discriminatory treatment, as well as discriminatory termination. The courts looked at that Ms. Arnold, that Ms. Richardson was not qualified to be served as a city clerk at the time that she was terminated. Well, the record showed that Ms. Richardson, in fact, went through the mandatory training, qualification, that she met all the problems that face the case. However, the courts interjected in the promulgation stage a reasoning as to why she wasn't qualified. The reason was that the city council had no trust in her or confidence. They relied to a case in the Middle District of Alabama where an individual was not qualified, one, not to be a lawyer. They wanted a lawyer for the position. That person was not a lawyer, and that issue was a policymaking position. Well, in this case, the city clerk, it's a ministerial administrative position. You take minutes. You keep the records. I do other things as warranted by the mayor and council. So, the trust issue— Council? Council? Sorry, this is Robert Luck. I want to ask a question regarding the qualification issue that you're talking about right now. The magistrate judge found a recommended summary judgment in part on that claim, on the claim regarding disparate treatment, because of the lack of qualifications. Where in your objections, was there a specific objection to that part of the magistrate judge's recommendation with regard to the disparate treatment claim? We put it in our brief, our initial brief, and I have to go back to the actual— I'm not talking about the initial brief. I agree. You did argue in the initial brief. My question is more, in your objections to the report and recommendation of the magistrate judge to the district court judge here, where in your objections, was there a specific and pointed objection to that recommendation of the magistrate judge? Well, I don't believe that was actually put into the response of the recommendation by the magistrate judge as it relates to her qualification. We believe the record itself would show that she was qualified in regards to the district court—I'm sorry, the recommendation for the magistrate judge. Council, two-minute warning. We didn't actually place that within the objection. However, the record was clear that she was qualified and we presented to the courts and the district courts. I had an opportunity to review that, what we placed into our initial brief, and into the record of qualification. One thing I want to make a point, as we talk about the promulgation case of the Madonna Douglas, this court has always established that that is not the only way that an individual can make a race discrimination case. You can look at the circumstances here in which we believe that the facts of the circumstances here would show that, when all placed together, that it was the City of Snellville through a city council had discriminatory intent here. Consistent with not appointing African-Americans to the board, when Ms. Richards was appointed, they did the same thing. They refused to recognize her and instead affirmed a white woman, Ms. Arnold. Even though she had 35 years of government experience, no questions, no interview, anything in regards to the term of qualifications. Specifically, when you look at all the duties that was here, because the mayor ultimately had the sole authority to appoint the city clerk. When you look at all the duties that were stripped away from Ms. Richards in ab initio, you can see that the City of Snellville was not even consistent with their own authority in removing duties and jobs and changing from one city clerk to another city clerk. As this court pointed out in Lewis, that the benefit of a white individual to the detriment, specifically in Lewis, to a black woman would be a reasonable jury can conclude that discriminatory intent was afoot here. Other claims represented hostile work environment claims as well as relates to Ms. Richardson and when she actually took the position. You can finish your sentence, counsel. Other claims were made hostile work environment claim to the title seven when it relates to when she actually took the position and the things that she was dealing with, regulating her job, one, two, taking her job duties, harassing her for minutes. The record showed that these things were not happening to the previous clerk. In fact, it was nitpicky issues and the city council would not even approve her minutes and would wait until the last minute to make a public display and embarrass her as it relates to her minutes opposed to the previous clerk that they would approve the minutes with errors. Never ever do any embarrassment from the diocese, but would constantly and continuously do those type of things, prevent her from going to classes, training as a director department, I guess in that position, they removed her from that. Counsel, counsel, I'm sorry. Your time has expired. You do have three minutes for rebuttal. If you'd like to take them now, that's fine. Otherwise, you've reserved three minutes for rebuttal. Okay, thank you, Mr. Daniels. We'll hear now from Ms. Denton. Good morning, Your Honor, and may it please the court. My name is Laura Denton, and I, along with my co-counsel, Sharon Morgan, represent the appellee in this case, the city of Snellville, Georgia. Magistrate Judge Baverman and District Court Judge Roth both correctly determined that summary judgment was appropriate here. Counsel. And we ask that you do the same. Yes, Your Honor. Counsel, I'm sorry. This is Robin Rosenbaum. I agree that this case may have some legal problems, but I'm very concerned about the record that I've reviewed in this case. And I was wondering if you could answer some questions for me. First, can you confirm that in 2014, the plaintiff here, Ms. Richardson, was the first black employee that the city government ever had? Your Honor, that is not in the record. But regardless of whether or not Ms. Moreland Richardson was the first African-American clerk, she has failed to produce any viable evidence that she was discriminated against, suffered from a racial hostile work environment, or retaliated against for engaging in protected activity. Counsel. I mean, there does seem to be evidence that she was treated rudely by most of the other city employees. And if she was the first and only black employee of the city government, and everybody's treating her rudely, and is constantly making these kinds of decisions that weren't made with respect to her predecessor, and then she's immediately terminated upon, in fact, on the very day that Mayor Wicks takes office, why is it not a reasonable inference that the reason that she's being treated rudely by everybody has to do with the fact that she's black, especially when she has reported comments like, I'm not going to work with that woman, whether it's I'm not going to work with that woman or with that black woman. And when she's reported comments about the monkey stuff. I mean, why isn't it a reasonable inference that the reason that she's being treated that way is because of her race? Yes, Your Honor. It's not a reasonable inference because even taking plaintiff's testimony as true for purposes of summary judgment, and that the council treated her rudely, which, as an aside, doesn't constitute race discrimination. Well, counsel, I'm sorry. If you're being treated rudely by everyone on a constant basis, and the sole reason is because you happen to be black, I beg to differ with you. I think that does constitute race discrimination. It constitutes a hostile work environment. I mean, if you are continuously, every single day, the people that you have to interact with on a daily basis to do your job, every one of them is acting rudely and unhelpful, uncooperative, and doing everything they can to make your job more difficult. Why doesn't that change the terms and conditions of your employment and render your employment a hostile work environment? Your Honor, I would address first the contention that her being treated rudely was solely based on her race. Rather, it had to do with the power struggle that existed between the mayor and council that ultimately led to the appointment of city clerk in the first place, in that the mayor believed she had the sole authority to appoint certain positions, including the city clerk, and the council disagreed with that authority. And so that's where that power struggle unfortunately bled into plaintiff and her, the council's refusal to recognize her officially or initially as city clerk. And then once they entered into the settlement agreement, the council did recognize plaintiff as city clerk, and there is evidence in the record that the council treated her the same as her predecessor, in that both the council gave feedback on minutes to both plaintiff and her predecessor, and there's no evidence that the plaintiff was treated rudely all the time, even crediting her testimony. And regarding Judge Rosenbaum, your questions as to the hearsay comment of what someone said to someone else about working with that woman or that black woman, there's no evidence in the record that that hearsay statement had anything to do with plaintiff. And regarding the supposed Facebook conversation, which is not in the record, although plaintiff testified she had the Facebook post and just never produced it, there's no evidence as to when that occurred, what actually was said, and who actually said what. But even taking into account those two incidents of racial harassment. Well, actually, I agree with you. There's not evidence of the actual Facebook post, but she did testify that what was said was something to the effect of, can't you keep your monkeys in control over there? And which responded that he kept his monkeys in control, or something to that effect. Isn't that in the record? Yes, Your Honor. Isn't that what she testified to? She did testify to that, and so that is in the record. You know, she uses the word monkeys plural, but yet it's her testimony. She was the only African-American in City Hall, therefore belying her contention that that even refers to her. But even taking into account... Counsel, I'm sorry. Most respectfully, I disagree. I mean, whether or not the person who made the comment knew how many black employees there were in the city government has nothing to do with whether or not the comment reflects racism on the... whether the response to the comment reflects racism on the part of her employer, does it? No, Your Honor. But even if we were to consider plaintiff's testimony on the supposed Facebook post, that single, or even if we took into account the hearsay testimony regarding what one employee said to another employee, those two incidents of alleged racial harassment over the course of plaintiff's 16-month employment does not rise to the level of pervasive or severe harassment. And even if this court were to conclude that it would arise to the level of severe pervasive harassment, although there is ample case law to say otherwise in this court, plaintiff cannot establish any basis for holding the city liable for any alleged racial harassment. To that end, while plaintiff argues on appeal that she brought a tangible employment action and raised harassment claim, in other words, she contends the harassment culminated in her not being reappointed as city clerk, she failed to allege that claim in her amended complaint, and she failed to exhaust her administrative remedies as to such a claim during the EEOC stage. And notably, plaintiff failed to raise any objections to the magistrate judge's finding that plaintiff failed to exhaust her administrative remedies. And as Judge Luck pointed out, she also failed to object to the magistrate judge's report and recommendation as to whether or not plaintiff was qualified going through the race discrimination claim. And as such, the city respectfully contends that plaintiff has waived the right to challenge these factual and legal conclusions on appeal. The plaintiff also failed to address the city's argument, both below and on appeal, that it satisfied both elements of the applicable Farragher defense, where here the city took reasonable care to prevent and correct promptly any harassing behavior, and plaintiff unreasonably failed to take advantage of the city's preventative opportunities. Going to plaintiff's race discrimination claim, she failed to establish evidence that her and her predecessor were similarly situated under this court's in-box decision of Lewis v. City of Union City. Counsel, this is Russell Luck. That really doesn't matter because the magistrate judge concluded and the district court adopted the conclusion that the interim clerk was a sufficient comparator, right? Only, Your Honor, as it relates to the adverse employment action as to not being reappointed or termination. That's right. However you want to couch it. That's right. Right. As to her other alleged adverse action relating to her feeling like she didn't receive the same job duties and salary as her well-experienced and long-tenured predecessor, the magistrate judge and district court judge both determined that plaintiff could not establish that she was similarly situated to her predecessor. But at least as to her termination claim, she has met that element for summary judgment purposes of the prima facie case, correct? Correct, Judge Luck. But to your point that you raised during plaintiff's initial argument, she failed to demonstrate in the lower court that she was qualified to be city clerk under the new administration. And as such, the magistrate judge determined that she could not satisfy prima facie case of race discrimination. And the district court properly adopted that finding as plaintiff never objected to it, as Judge Luck, you pointed out. But even if this court were to decide or determine that she satisfied a prima facie case, the city has legitimate non-discriminatory reasons for all the plaintiff's alleged adverse employment actions. And plaintiff has not established any evidence of pretext. Counsel, this goes to Judge Rosenbaum's question, so I apologize if I'm repeating anything. But as to pretext, I understand that the non-discriminatory reason for termination is alleged to be that the new mayor didn't trust her because she was associated with the prior administration and because of some of the things regarding her minutes. And I understand that those are legitimate non-discriminatory reasons. But on pretext, does it not rebut that to point to the evidence that Judge Rosenbaum discussed, that the new mayor specifically used that term in reference to the plaintiff and her husband? No, Your Honor. That evidence would not support a finding of... That the real reason was discrimination, that he called someone that word? That he called, that he used the word monkeys? In relation to the plaintiff and her husband, yes. Or at least adopted that reference by someone else, yes. That evidence is tenuous at best, which both the magistrate and... How is it tenuous? The mayor confirmed in her deposition that that happened. This is Judge Carnes. I need a little clarification on the facts, Judge Lutz's question. I understood the Facebook page was somebody writes it in and says to the mayor, can't you keep your monkeys under control? He says, I keep my monkeys under control. Clarify for me, was there any specific reference to indicate that monkeys, plural, referred to the plaintiff here? That's actual clarification I need from you, counsel. Absolutely not, Judge Carnes. There's no evidence in the record that that comment, even if it was made, which we don't know because the Facebook post was never produced, there was no indication... How do we know about the Facebook post? How did that get into evidence if it was never produced? Plaintiff testified to... Counsel, two-minute warning. Plaintiff testified to have seen it. She never produced the Facebook page. Correct, Judge Carnes. Is there any... So we only know her description. We don't know what else the writer in the Facebook page may have been referring to. Correct, Judge Carnes. All right. Judge Lutz, I want to make sure I'm addressing your question sufficiently. What did the mayor testify regarding that post? So the former mayor, so Kelly Kautz was the only mayor who was deposed in the case. That's who I'm talking about. Okay. Yes, Your Honor. And she testified generally to a Facebook post. She never testified, I don't believe that she ever saw it, nor did she testify as to who said what, other than she may have heard that the word monkeys was used. Did the plaintiff testify that it was her understanding from the mayor that it was in reference to her and her husband? Your Honor, I don't believe that the plaintiff testified to that in her deposition. Okay. And this is Judge Carnes again. I also need one factual clarification. And I forgot the name of McKay, or the employee that allegedly said she would not work with that woman referring to the plaintiff. And I can't find it right here in my notes. I believe you had argued in your brief, or someone had pointed out that the source for that would be the former mayor, Kautz, who, if I'm remembering this correctly, said she's not clear who said it. She had heard it, and she's not clear that they said I wouldn't work with that woman or that black woman. Was it as fuzzy as that, or was there more specificity to that particular allegation? It was as fuzzy as that, Judge Carnes. Counsel, your argument has expired. Thank you, Your Honor, for your time. All right, thank you very much, Counsel. And Mr. Denny, you've preserved three minutes of rebuttal time. Your Honor, as it relates to the treatment that Ms. Richardson was treated differently from other employees within the city, in fact, the mayor testified, even though she was in litigation with the city council over the appointments issue, that she was still treated favorably. They were shaking her hand, speak to her, and such, even sent, I believe, flowers when she had her baby, as well as the new appointed city attorney, Chris Anulowicz. He also was treated kindly, with respect, over there in Snailville after the previous city attorney was removed. So, and Chris Anulowicz and Mayor White, the mayor, the city council, Ms. Richardson, she was the only one treated differently over in the city. Also, judges, as it relates to the hostile work environment, a case, Ryan v. Jones, out of this court, dealt with an issue of duties being taken away from an individual, not just duties, but individuals being embarrassed. Counsel, I apologize for interrupting you, but I did want to drill down on this, since we had a number of questions in your opposing counsel's discussion. So, I'm looking at page 19 of your brief, and it states, quote, Council Member Mayor Witt and Council Members Emanuel and Howard were members of a Facebook group known as, quote, Citizens for a Better Snailville, end quote, that referred to Appellant and her husband as, quote, monkeys, end quote. Council Members Witt and Howard engaged in a conversation where Appellant and her husband were referred to as, quote, monkeys. And it's citing docket entry 37 at 241, and docket entry 44 at 245. What is the evidence that Appellant herself and her husband were referred to as that term? Well, Your Honor, the Appellant and her husband, her husband actually would go to the dais and speak on behalf of his wife if certain things were going on, and it was obviously public in an opening. And that's why, when the issue of controlling your monkeys over in Snailville, hey, we control our monkeys, and obviously monkey is a term that has been used towards derogatory terms towards African Americans. But the only black people in the city of Snailville, the city government, was Appellant, and occasionally her husband would speak to a dais on behalf of his wife. Did she testify, did the plaintiff testify that she believed that statement was in reference to her and her husband? Yes. Did Mayor Kautz testify to who that was referred to, or did she just say it happened? Mayor Kautz said it happened. Okay. Thank you, Counsel. Your Honor, in the... Counsel, Counsel, I'm sorry, I didn't hear what you were about. Were there any other black employees of the city government or, excuse me, black employees with whom Mayor Witt worked, other than Appellant? What we had at the time, you had a volunteer for the city government, African Americans volunteered for the city government, and, in fact, that volunteer, once the new administration came in with Mayor Witt, he was actually terminated, removed from the volunteer position without any cause. He was doing a great job. That's actually in on the record as well. And you had some instances where people, African Americans did volunteer work, like Pastor Elijah Coggins, that's on the record, where they, him and Mayor Kautz started the... Counsel, your Honor, may I have this file? It's on the record. No, may I finish? Your Honor? You can finish your sentence. The city of Louisville terminated MLK in March once the new administration came in as well. Thank you very much, Counsel.